**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOHN SARANCHUK,** *et al.,* | : | |
| | : | **CIVIL ACTION NO. 3:15-0893** |
| **Plaintiffs** | : | |
| | : | **(JUDGE MANNION)** |
| **v.** | : | |
| | : | |
| **DAN LELLO,** *et al.,* | : | |
| | : | |
| **Defendants** | : | |

## MEMORANDUM

Pending before the court is the defendants' motion for summary judgment with respect to all of the plaintiffs' claims against them. (Doc. 30). Based on the court's review of the motion and related materials, the defendants' motion will be **GRANTED IN PART** and **DENIED IN PART**.

## I.    BACKGROUND

The following are the undisputed facts material to resolving the defendants' motion for summary judgment.[1] Named plaintiff John Saranchuk began working for the Dupont Borough Police Department ("the Police

---

[1] The relevant facts are taken from the pleadings, (Doc. 1; Doc. 14), the defendants' statement of material facts, (Doc. 32), the plaintiffs' statement of material facts, (Doc. 34), and both parties' corresponding evidentiary exhibits. Any facts that remain in dispute are noted as such.

Department") in 2006. (Doc. 32; Doc. 34). When he was hired as a police officer, Saranchuk worked on an hourly basis, and he did not initially sign any contract dictating his work conditions or the number of hours he would be assigned to work each week. (Doc. 32; Doc. 34). Saranchuk was eventually promoted to the rank of sergeant and began working up to forty hours per week, but he received no benefits and was still considered an hourly employee of the Dupont Borough. (Doc. 32). In March 2011, Saranchuk was named the Police Department's "Officer in Charge," which is the functional equivalent of a Police Chief within the Dupont Borough. (*Id.*).

During Saranchuk's term as Officer in Charge, a group of police officers working at the Police Department was organized for the purpose of strengthening their ability to bargain collectively with the Dupont Borough. (Doc. 1; Doc. 14). This group was known as the Dupont Borough Police Officers Association ("the Police Association"), and Saranchuk became the group's first leader. (Doc. 1; Doc. 14). Several other named plaintiffs, including John Maciolek, Jason Kwiatkowski, and Charles Yarick, were also affiliated with the Police Association. (Doc. 1). Acting through the Police Association, Saranchuk filed for arbitration with the Dupont Borough and ultimately was

able to extend and renew a prior collective bargaining agreement for a new term, lasting from January 1, 2013 through December 31, 2016.[2] (Doc. 1; Doc. 14). The Police Association's protracted arbitration proceedings with the Dupont Borough cost both parties a great deal of time and expense. (Doc. 1).

Following the Police Association's formation, many of the factual circumstances regarding its subsequent impacts on Dupont Borough personnel are murky and disputed by the parties. What remains clear is that bad blood and mistrust began to develop between members of the Police Association and leadership figures at the Dupont Borough, including Mayor Dan Lello and Dupont Borough Council Members Stanley Knick, Mark Kowalczyk, Josephine Hansen, and Bernard Zielinski, all of whom are named defendants in this action. (Doc. 1; Doc. 14; Doc. 32; Doc. 34).

On August 7, 2014, another named defendant, Sean Murray, was appointed as the new Officer in Charge of the Police Department. (Doc. 32; Doc. 34). All of the named defendants who are members of the Dupont Borough Council (Knick, Kowalczyk, Hansen, and Zielinski) voted in favor of Murray's appointment as Officer in Charge. (Doc. 33-6). A Luzerne County

---

[2] While the existence of this renewed collective bargaining agreement is not in dispute, neither party has offered the agreement as part of the evidentiary record, so its specific terms remain unknown.

Detective then contacted Saranchuk and told him to refrain from coming into work until further notice. (Doc. 1; Doc. 14; Doc. 32, Exh. A). On that same evening, the locks on Saranchuk's office were changed, barring his access to the premises. (Doc. 33-4). The following morning, a conversation transpired between defendant Murray and plaintiff Kwiatkowski during which Murray insinuated that Saranchuk was under investigation for misconduct during his term as Officer in Charge. (Doc. 1; Doc. 32, Exh. E).

On September 5, 2014, Saranchuk appeared for a *Loudermill* pre-termination hearing, but he was informed that the hearing would need to be rescheduled for a future date and that the written accusations against him would be provided at some future time. (Doc. 1; Doc. 14). Thereafter, Saranchuk was officially terminated from his employment with the Police Department, and he never again returned to work there. (Doc. 1; Doc. 14; Doc. 32; Doc. 34). While the plaintiffs allege that Saranchuk was fired in retaliation for engaging in protected union activities through the Police Association, the defendants counter this assertion, arguing that Saranchuk had in fact lost the confidence of the District Attorney and the Dupont Borough leadership over the course of several incidents involving a lack of

professionalism, frequent miscommunications, and poor police practices.[3] (Doc. 1; Doc. 32, Exh. B).

The other named plaintiffs affiliated with the Police Association were also affected by this rapid personnel change within the Police Department. Charles Yarick began working at the Police Department in 2007. (Doc. 32, Exh. G; Doc. 34). Jason Kwiatkowski and John Maciolek joined in 2013. (Doc. 32, Exh. F; Doc. 34). All three plaintiffs, at least initially, worked there on an hourly basis.[4] (Doc. 32, Exh. E). Beginning in September 2014, during the aftermath of Saranchuk's ouster and Murray's appointment as Officer in Charge, all three plaintiffs saw their work hours gradually reduced from the Police Department's work schedule. (Doc. 1; Doc. 14). At the same time, the Dupont Borough began hiring new police officers to fill the resulting vacancies in the work schedule. (Doc. 1; Doc. 14). These trends continued until the plaintiffs either were left with a minimal number of work hours or were effectively terminated from their employment at the Police Department. (Doc. 1; Doc. 32; Doc. 34). The defendants remained in contact with one another

---

[3] The Dupont Borough's exact motivations for removing Saranchuk from the Police Department's work schedule remain in dispute.

[4] Since the collective bargaining agreement was not provided as part of the evidentiary record, the court is unable to ascertain whether these plaintiffs' status as hourly employees was ever altered due to such an agreement.

throughout the time leading up to these events, just as local officials working on behalf of the same municipality might be expected to do, but the extent of each defendant's knowledge of, or acquiescence to, this reduction in the plaintiffs' work hours remains in dispute. (Doc. 33; Doc. 34).

The plaintiffs, who are now former officers of the Police Department, perceived these work reductions as arbitrary disciplinary actions without any sound basis, but the defendants, who are current and former municipal government officials within the Dupont Borough, claim that the work reductions were in fact due to specified instances of misconduct from the plaintiffs. (Doc. 1; Doc. 14). While the Dupont Borough leadership did receive several citizen complaints from local residents about the plaintiffs' handling of police matters within the town, numerous factual disputes and unresolved allegations remain regarding the factual accuracy of these complaints.[5]

The plaintiffs further allege that they were threatened, harassed, and defamed throughout the course of their dealings with the defendants. (Doc. 1;

_____

[5] The specific allegations of wrongdoing against the plaintiffs during their time with the Police Department are immaterial to the resolution of the defendants' motion for summary judgment, so they are not discussed herein. Factual disputes remain as to the precise reasons for the plaintiffs' firing from the Police Department and the extent to which Dupont Borough officials facilitated these firings.

Doc. 34). The defendants deny this, asserting that any purported hostile interactions or harsh exchanges with the plaintiffs stemmed from genuine concerns over their fitness as police officers. (Doc. 14; Doc. 32). The parties dispute the specifics of these confrontations, including who they were directed toward and what motivated them, but said incidents unquestionably escalated tensions between the parties. (Doc. 1; Doc. 32; Doc. 33-11; Doc. 33-13).

On May 5, 2015, the plaintiffs filed the instant action, (Doc. 1), against the abovementioned Dupont Borough officials, in both their individual and official capacities, and against the Dupont Borough itself, bringing a broad range of federal and state claims for relief: Count I for violations of the Due Process Clause "under 42 U.S.C. §1983 and the Fifth, Sixth, and Fourteenth Amendments;" Count II for "civil rights conspiracy to deprive the plaintiffs' federally-protected rights under 42 U.S.C. §§1985-1986 and the Fifth, Sixth, and Fourteenth Amendments;" Count III for "Equal Protection" Clause violations under 42 U.S.C. §1983 and the Fourteenth Amendment; Count IV for "*Monell* liability" under 42 U.S.C. §1983; Count V for "civil conspiracy;" Count VI for "intentional infliction of emotional distress;" Count VII for breach of the "implied covenants of good faith and fair dealing;" Counts VIII and IX for "intentional interference with advantageous relations;" Count X for "abuse of process;" Count XI for "defamation;" and Count XII for "loss of consortium."

On July 20, 2015, the defendants filed their answer, (Doc. 14), to the alleged claims for relief. The parties then engaged in fact discovery, and on February 13, 2017, the defendants moved for summary judgment on all counts in the plaintiffs' complaint and on the affirmative defense of qualified immunity. (Doc. 30; Doc. 31). Thereafter, the plaintiffs filed their brief in opposition to the defendants' summary judgment motion. (Doc. 33). This matter has been fully briefed and is now ripe for summary judgment.

## II.    SUMMARY JUDGMENT STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A factual dispute is "genuine" if a reasonable jury could return a verdict for the non-moving party, and it is "material" if proof of its existence or nonexistence would affect the outcome of the trial under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-57 (1986); *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1078 (3d Cir. 1992). "[T]his standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the

requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48.

To determine whether a genuine dispute of material fact exists, the court should consider the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Turner v. Schering-Plough Corp.*, 901 F.2d 335, 340 (3d Cir. 1990). In doing so, the court must view all the evidence and any inferences drawn therefrom in the light most favorable to the non-moving party. *Andreoli v. Gates*, 482 F.3d 641, 647 (3d Cir. 2007) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 278 (3d Cir. 2000)). However, the court's function at the summary judgment stage "is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. *See also Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (noting that the court may neither weigh the evidence nor make credibility determinations).

Parties seeking to establish that a fact is or is not genuinely disputed may not rely on unsubstantiated allegations; rather, they must support such assertions by "citing to particular parts of materials in the record" to demonstrate that the adverse party's factual assertion either lacks support from cited materials or is unsupported by admissible evidence. Fed. R. Civ. P.

56(c)(1). *See also Celotex Corp.*, 477 U.S. at 324 (requiring evidentiary support for factual assertions made during summary judgment). A party's failure to properly support or contest an assertion of fact may result in that fact being considered undisputed for purposes of the summary judgment motion, although the court may also grant parties an opportunity to properly provide support for an asserted fact. Fed. R. Civ. P. 56(e).

To prevail on a motion for summary judgment, the moving party must affirmatively identify those portions of the record that demonstrate the absence of a genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 323-24. The moving party can satisfy this burden by showing that "on all the essential elements of its case on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *In re Bressman*, 327 F.3d 229, 238 (3d Cir. 2003). *See also id.* at 325.

If the moving party meets this initial burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts" to avoid summary judgment. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986)). Rather, the non-moving party must provide "sufficient evidence" for a jury to return a verdict in its favor; "if the [non-movant's] evidence is merely colorable or not significantly probative,

summary judgment should be granted." *Id.* (quoting *Armbruster v. Unisys Corp.*, 32 F.3d 768, 777 (3d Cir. 1994)).

## III. DISCUSSION

As a preliminary matter, several of the plaintiffs' claims under Count I of the complaint fail as a matter of law. Specifically, the complaint alleges "violations of [the] plaintiffs' substantive and procedural due process rights under 42 U.S.C. §1983 and the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution." (Doc. 1, at 30).

"To establish a claim under §1983, a plaintiff must allege (1) a deprivation of a federally protected right, and (2) commission of the deprivation by one acting under color of state law." *Lake v. Arnold*, 112 F.3d 682, 689 (3d Cir. 1997). Notably, §1983 "is not itself a source of substantive rights" but merely provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)). The first step in any suit brought under §1983 is to "isolate the precise" constitutional right allegedly infringed. *Id.* at 394. "The validity of the claim must then be judged by reference to the

specific constitutional standard which governs that right, rather than to some generalized . . . standard." *Id.*

The plaintiffs' claims under the Fifth Amendment cannot be sustained as applied to the facts at hand, as the Fifth Amendment restricts only the actions of the federal government, not those of state or local government officials. *See, e.g.*, *Nguyen v. U.S. Catholic Conference*, 719 F.2d 52, 54 (3d Cir. 1983). The court will therefore grant summary judgment in favor of the defendants as to the Fifth Amendment claims against them.

In a similar vein, the Sixth Amendment relates solely to the rights of criminal defendants, but the plaintiffs' claims here are civil in nature. *See* U.S. CONST. amend. VI ("In all criminal prosecutions"). The court will therefore grant summary judgment in favor of the defendants as to the Sixth Amendment claims against them.

Additionally, while the plaintiffs do mention in passing that these facts give rise to potential "First Amendment retaliation" implications, they do not allege any First Amendment claims as official counts in the complaint. (Doc. 1, at 28). The court will therefore refrain from undertaking a First Amendment analysis herein. With respect to Count I of the complaint, this leaves for consideration the plaintiffs' §1983 claims for violations of the Due Process

Clause of the Fourteenth Amendment. The court will now undertake an analysis of the remaining counts in the complaint. (Doc. 1; Doc. 30; Doc. 31).

### A. Procedural Due Process

A procedural due process analysis involves a two-step inquiry: (1) whether the plaintiff was deprived of an interest that is encompassed by the Fourteenth Amendment's protection of "life, liberty, and property," and (2) whether the procedures given to the plaintiff comport with all constitutional requirements such that they amounted to "due process of law." *Hill v. Borough of Kutztown*, 455 F.3d 225, 234 (3d Cir. 2006) (citing *Alvin v. Suzuki*, 227 F.3d 107, 116 (3d Cir. 2000)); *Mariano v. Borough of Dickson City*, 40 F.Supp.3d 411, 421 (M.D. Pa. 2014). To have a property interest in a job, "a person must have more than a unilateral expectation of continued employment; rather, she must have a legitimate entitlement to such continued employment." *Elmore v. Cleary*, 399 F.3d 279, 282 (3d Cir. 2005) (citing *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972)). Whether a legitimate entitlement, and therefore a property interest, exists is a question of state law. *See, e.g.*, *Kelly v. Borough of Sayreville*, 107 F.3d 1073, 1077 (3d Cir. 1997) (noting that "[s]tate law creates the property rights protected by the Fourteenth Amendment").

The court must first determine whether the plaintiffs had a protected property interest in their continued employment. The plaintiffs argue that their property interest is derived from a collective bargaining agreement that was renewed and extended for a new term by Saranchuk and the Police Association. (Doc. 1; Doc. 33; Doc. 34). The defendants respond by arguing that the plaintiffs were in fact hourly employees with no protected property interest to speak of. (Doc. 31; Doc. 32). The Third Circuit has previously relied on a Pennsylvania state statute in determining that members of a borough "police force" generally do have a protected property interest in their employment. *See Dee v. Borough of Dunmore*, 549 F.3d 225, 230-31 (3d Cir. 2008) (relying on 8 PA. CONS. STAT. §1190). The definitions section of this same statute, however, specifically excludes "police serving . . . on an hourly or daily basis" from the general definition of "police force." 8 PA. CONS. STAT. §1170. As a result, borough police officers who work on a full-time or salaried basis have a protected property interest in their employment, while those working on a part-time, hourly, or daily basis do not. *See Mariano v. Borough of Dickson City*, 2014 WL 5795679, at *5 (M.D. Pa. Nov. 6, 2014); *Stevens v. Telford Borough*, 2014 WL 4056952, at *2 (E.D. Pa. Aug. 14, 2014); *Rosati v. Borough of Hellertown*, 1992 WL 396769, at *3 (E.D. Pa. Dec. 24, 1992).

State statutory law, therefore, does not confer a property interest upon the plaintiffs here.

The plaintiffs' only other potential source of a protected property interest would be the collective bargaining agreement that was supposedly extended to cover the plaintiffs here. (Doc. 1; Doc. 14). Importantly, however, it is the precise terms of a collective bargaining agreement that can confer a property interest, not the agreement's mere existence alone. *See, e.g.*, *Wilson v. MVM, Inc.*, 475 F.3d 166, 177 (3d Cir. 2007) (citing *Kelly*, 107 F.3d at 1077). The parties here do not dispute that some variety of collective bargaining agreement exists. (Doc. 1; Doc. 14). Far less clear, however, are the precise terms of said agreement. The defendants, who now move for summary judgment on this issue, claim that "pursuant to Article 3 of the contract . . . the police officers . . . are not guaranteed any specific number of days or hours of work per week." (Doc. 14, at 6). The plaintiffs, opposing summary judgment, assert that "[t]hrough the past practice clause included in the collective bargaining agreement . . . [the plaintiffs were] guaranteed to work at least 32 hours per week." (Doc. 34, at 16). Rather than offering the agreement's substantive terms in their entirety as evidentiary support, both parties instead rely on contradictory allegations regarding what the collective bargaining agreement purports to do.

At the summary judgment phase, if a factual issue arises that cannot be resolved without a credibility determination, the court must credit the non-moving party's evidence over that presented by the moving party. *See Anderson*, 477 U.S. at 255. This dispute of material fact about the collective bargaining agreement's precise contours and protections thus precludes summary judgment on the plaintiffs' procedural due process claims. The court will therefore deny the defendants' motion for summary judgment as to the plaintiffs' Fourteenth Amendment procedural due process claims against them. Without any resolution at this phase on whether the plaintiffs possessed a protected property interest, the court need not undertake an inquiry into the adequacy of the procedures that were provided to the plaintiffs.

## B. Substantive Due Process

The defendants next move for summary judgment as to the plaintiffs' substantive due process claims. When a challenged action is "non-legislative" in nature (such as an adverse employment decision), the substantive component of the Due Process Clause can protect citizens against certain government deprivations of fundamental constitutional rights if such deprivations are "arbitrary, irrational, or tainted by improper motive" or if the government's conduct is so egregious that it "shocks the conscience."

*Nicholas v. Pennsylvania State University*, 227 F.3d 133, 139 (3d. Cir 2000) (citing *Woodwind Estates, Ltd. v. Gretkowski*, 205 F.3d 118, 123 (3d Cir. 2000)). In contrast to a procedural due process challenge, the protection of a given property interest under the substantive component of the Due Process Clause is "not determined by reference to state law." *Id.* at 140. Rather, the threshold inquiry is whether the property interest being deprived is "fundamental" under the Constitution. *Id.* (citing *Independent Enters. Inc. v. Pittsburgh Water & Sewer Auth.*, 103 F.3d 1165, 1179 n.12 (3d Cir. 1997)).

The Third Circuit has predominantly limited non-legislative substantive due process review to cases involving real property ownership; it has been far more reluctant to extend substantive due process protection to other property interests. *Id.* at 141. In *Nicholas*, the Third Circuit held that a plaintiff's tenured public employment at a state-run university was not a fundamental property interest entitled to substantive due process protection. *Id.* at 138. The plaintiffs in the instant action have an even weaker claim to a fundamental property interest, as their employment was neither tenured nor salaried. (Doc. 32, Exh. E; Doc. 34). The plaintiffs therefore have no valid claim to protection under the substantive component of the Fourteenth Amendment's Due Process Clause. Accordingly, the court will grant the defendants' motion for summary judgment as to the plaintiffs' substantive due process claims against them.

**C. Conspiracy to Interfere with Civil Rights**

The defendants next move for summary judgment as to the plaintiffs' claims of conspiracy to interfere with civil rights under 42 U.S.C. §§1985-1986. §1985(3) prohibits actions taken in concert by two or more persons "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. §1985(3). To state a valid claim under §1985(3), the plaintiffs must further demonstrate that the defendants (1) committed "an act in furtherance of the conspiracy . . . whereby a person is injured . . . or deprived of any right or privilege of [United States citizenship]," (2) were "motivated by a discriminatory animus against an identifiable class," and (3) caused discrimination that is "invidious." *Farber v. City of Paterson*, 440 F.3d 131, 134-35 (3d Cir. 2006) (citing *United Bhd. of Carpenters & Joiners v. Scott*, 463 U.S. 825, 828-29 (1983)).

Here, the plaintiffs allege that they were conspired against due to their labor union activities and their membership in a unionized group. (Doc. 1; Doc. 33; Doc. 34). The Third Circuit has held that discrimination against a class on the basis of its political affiliation, such as membership in a labor union, is not sufficiently "invidious" to state a valid claim under §1985(3). *Farber*, 440 F.3d at 135 (holding that "unlike discrimination against a class on the basis of race,

- 18 -

sex, or mental retardation, discrimination on the basis of political affiliation is not, as a matter of law, discrimination so invidious such that §1985(3) would apply"). In explaining the "invidious" requirement, the Third Circuit opined that discrimination against groups based on "immutable" (unchangeable) characteristics, such as race, gender, or mental illness, is inherently invidious because such traits are "determined by the accident of birth," while discrimination based on "mutable" (changeable) characteristics, such as opinion or conduct, is far less likely to qualify under §1985(3). *Id.* at 137. Since the plaintiffs here share a group membership based solely on their political affiliation, they do not comprise a cognizable class for purposes of §1985(3). *See Naviglia v. Borough of Springdale*, 2016 WL 4366666, at \*7 (W.D. Pa. Aug. 16, 2016). The plaintiffs have thus failed to allege the invidiously discriminatory animus required to sustain a claim under §1985(3).

A claim under 42 U.S.C. §1986 provides an additional safeguard for those rights protected under §1985. To sustain such a claim, the plaintiff must demonstrate that "(1) the defendant had actual knowledge of a §1985 conspiracy, (2) the defendant had the power to prevent or aid in preventing the commission of a §1985 violation, (3) the defendant neglected or refused to prevent a §1985 conspiracy, and (4) a wrongful act was committed." *Clark v. Clabaugh*, 20 F.3d 1290, 1295 (3d Cir. 1994). Notably, "[b]ecause

transgressions of §1986 by definition depend on a preexisting violation of §1985, if the claimant does not set forth a cause of action under the latter, its claim under the former necessarily must fail." *Rogin v. Bensalem Twp.*, 616 F.2d 680, 696 (3d Cir. 1980). *See also Bernard v. E. Stroudsburg University*, 2017 WL 3499788, at *4 (3d Cir. Aug. 16, 2017) (affirming the District Court's grant of summary judgment on a §1986 conspiracy claim due to the inadequacy of the corresponding §1985 claim).

Since the plaintiffs here have not provided sufficient evidence for a jury to return a verdict in their favor on their §1985 claim, their claim under §1986 necessarily fails as a matter of law. Accordingly, the court will grant the defendants' motion for summary judgment as to the plaintiffs' claims for conspiracy to interfere with civil rights.

### D. Equal Protection

The defendants next move for summary judgment as to the plaintiffs' claims under the Equal Protection Clause of the Fourteenth Amendment. (Doc. 31). The plaintiffs' brief in opposition to the defendants' motion for summary judgment, however, does not specifically object to or respond to the defendants' motion on this issue. (Doc. 33). This alone would be enough to

grant the defendants' unopposed motion. Nevertheless, a brief analysis of the equal protection claim's merits is undertaken herein.

The plaintiffs' complaint appears to invoke the "class of one" theory of equal protection relief under the Supreme Court's framework articulated in *Village of Willowbrook v. Olech*.[6] (Doc. 1, at 35). According to this theory, a plaintiff may state a claim for a violation of the Equal Protection Clause when the plaintiff "alleges that he has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Hill*, 455 F.3d at 239 (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)).

While the plaintiffs here do allege intentional and discriminatory treatment without a rational basis for doing so, the Supreme Court clearly held in *Engquist v. Oregon Department of Agriculture* that "a class-of-one theory of equal protection has no place in the public employment context." *Engquist v. Oregon Dep't of Agric.*, 553 U.S. 591, 594 (2008). In so holding, the Supreme Court noted that there are certain instances, such as the public employment context, where it is "par for the course" for government officials to treat

---

[6] The court construes the plaintiffs' complaint, (Doc. 1), as invoking the "class of one" theory because it recites the words "class of one" but does not point to any other specific legal authority to support its equal protection claims.

"seemingly similarly situated individuals differently." *Id.* at 593 (noting that it is "not surprising" that the Supreme Court has never found the Equal Protection Clause implicated in this arena, given "the at-will nature of government employment"). If class-of-one claims were recognized in the employment context, any personnel action in which a wronged employee could conjure up a claim of differential treatment would "suddenly become the basis for a federal constitutional claim." *Id.* at 608.

The plaintiffs' equal protection claims thus fail as a matter of law. Accordingly, the court will grant the defendants' unopposed motion for summary judgment with respect to the plaintiffs' §1983 claims under the Equal Protection Clause.

### E. *Monell* Liability

The plaintiffs also raise claims against the Borough of Dupont under the framework articulated in *Monell v. New York City Department of Social Services*. Municipalities, like individuals, can be found liable for §1983 claims. *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978). However, a municipality may not be found liable under a theory of *respondeat superior* solely because it employs a culpable defendant. Rather, the plaintiff "must identify a policy or custom" leading to the alleged constitutional violation

"and specify exactly what the policy or custom was." *McTernan v. City of York*, 564 F.3d 636, 658 (3d Cir. 2009) (citing *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 232 (3d Cir. 2008)). "Policy" is made when a "decisionmaker possess[ing] final authority to establish a municipal policy with respect to the action" issues an official proclamation or states an official policy position. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986) (holding that municipal liability under §1983 attaches where a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy on the subject matter in question). On the other hand, a course of conduct is considered a "custom" when, "[a]lthough not authorized by written law, such practices of state officials [are] so permanent and well settled" as to virtually constitute law. *Monell*, 436 U.S. at 690. Importantly, however, a custom "may also be established by evidence of knowledge and acquiescence." *Beck v. City of Pittsburgh*, 89 F.3d 966, 971 (3d Cir. 1996) (citing *Fletcher v. O'Donnell*, 867 F.2d 791, 793 (3d Cir. 1989)).

This final potential avenue for sustaining a *Monell* claim against a municipality, knowledge or acquiescence, strikes the most direct blow to the defendants' motion for summary judgment on this issue. Here, the defendants have not provided sufficient evidence to establish conclusively that Dupont Borough officials, including Mayor Lello and Council Members Knick,

Kowalczyk, Hansen, and Zielinski, did not know about or acquiesce to an unlawful custom or practice within the Police Department. The evidence of record establishes that shortly after Saranchuk was fired and replaced by Murray, other named plaintiffs saw their hours similarly reduced. (Doc. 1; Doc. 14). It also suggests that there was a great deal of bitterness and animosity between the plaintiffs and the defendants following a protracted labor arbitration dispute and numerous disagreements on how individual police investigations should have been handled. (Doc. 1; Doc. 14; Doc. 32; Doc. 34). The Dupont Borough officials appeared to understand what was transpiring within the Police Department, even if they had not directly mandated it. Genuine disputes of material fact thus remain regarding the extent to which Dupont Borough officials were aware of and acquiesced to the actions taken to fire the plaintiffs. (Doc. 33; Doc. 34).

Viewing these facts in the light most favorable to the non-moving party, the defendants here have failed to affirmatively identify those portions of the record demonstrating the absence of a genuine dispute of material fact. *Celotex Corp.*, 477 U.S. at 323-24. Since the defendants have not satisfied their initial burden of proving that they are entitled to judgment as a matter of law on this issue, the court will deny their motion for summary judgment as to the plaintiffs' claims for municipal liability under *Monell*.

## F. Official Capacity Claims

The plaintiffs' complaint, (Doc. 1), brings causes of action against the defendants in both their individual and official capacities. Suits against government employees in their official capacities "generally represent another way of pleading an action against an entity of which an officer is an agent." *Kentucky v. Graham*, 473 U.S. 159, 165-66 (1985) (quoting *Monell*, 436 U.S. at 690 n.55). Accordingly, "it is a well-established practice in the Third Circuit to dismiss redundant §1983 claims asserted against public officers in their official capacities where a claim has also been made against the public entity that employs them." *M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist.*, 43 F. Supp. 3d 412, 419 (M.D. Pa. 2014) (citing *Jankowski v. Lellock*, 2013 WL 5945782, at *9 n.6 (W.D. Pa. Nov. 6, 2013)). This is especially true where the complaint brings a large number of counts such that retention of the redundant official capacity claims may confuse a jury and unnecessarily clutter the docket. *See Cuvo v. De Biasi*, 169 F. App'x 688, 693 (3d Cir. 2006) (affirming dismissal "against the officers in their official capacities because a lawsuit against public officers in their official capacities is functionally a suit against the public entity that employs them"). *See also id.*

Courts within the Third Circuit routinely dismiss §1983 claims asserted against individual defendants in their official capacity as being duplicative of a

claim against the municipality. Since the plaintiffs here have asserted both claims against Dupont Borough employees in their official capacities and claims against the Dupont Borough itself, the court will grant summary judgment in favor of the defendants as to the plaintiffs' claims against them in their official capacities.

### G. Qualified Immunity

The defendants next move for summary judgment on the issue of qualified immunity. "Government officials performing discretionary functions generally are shielded from liability for civil damages" if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). The question for analysis is "whether a reasonable public official would know that his or her *specific conduct* violated clearly established rights." *Grant v. City of Pittsburgh*, 98 F.3d 116, 121 (3d Cir. 1996) (citing *Anderson v. Creighton*, 483 U.S. 635, 636-37 (1987)). The qualified immunity defense thus depends on the "objective reasonableness of [the government official's] conduct as measured by reference to clearly established law." *Davis v. Scherer*, 468 U.S. 183, 191 (1984). This "is to say that in light of preexisting law, the unlawfulness must be apparent." *Anderson*, 483 U.S. at 640.

While the issue of qualified immunity is essentially a question of law, it necessarily entails a fact-intensive inquiry. *See Brown v. Grabowski*, 922 F.2d 1097, 1111 (3d Cir. 1990) (noting that "a court faced with . . . a claim of qualified immunity [should] . . . engage in an analysis of the facts adduced concerning the conduct of the official who claims immunity"). "Thus, crucial to the resolution of any assertion of qualified immunity is a careful examination of the record . . . to establish, for purposes of summary judgment, a detailed factual description of the actions of each individual defendant (viewed in a light most favorable to the plaintiff)." *Grant*, 98 F.3d at 122. The Third Circuit has stated that the defendant bears the burden of proof on qualified immunity. *See Burns v. Pennsylvania Dep't of Corrections*, 642 F.3d 163, 176 (3d Cir. 2011); *Kopec v. Tate*, 361 F.3d 772, 776 (3d Cir. 2004); *Beers-Capitol v. Whetzel*, 256 F.3d 120, 142 n.15 (3d Cir. 2001).

The defendants here assert that they acted to reduce the plaintiffs' work hours due to "performance issues," including poorly handled police matters and unfavorable reports from the District Attorney; these assertions would point toward a finding of objective reasonableness. (Doc. 31). The plaintiffs, however, meet these assertions with testimony that the police matters in question were indeed handled properly in light of the surrounding circumstances, that the District Attorney's scathing remarks were based on

misinformation and hearsay, and that the defendants' actions to reduce the plaintiffs' work hours were in fact motivated by improper purposes. (Doc. 33). The parties thus offer contradictory facts regarding the objective reasonableness of the defendants' actions, and this is precisely the factual inquiry that is pertinent to resolving the qualified immunity issue. "Just as the granting of summary judgment is inappropriate when a genuine issue exists as to any material fact, a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." *Curley v. Klem*, 298 F.3d 271, 278 (3d Cir. 2002).

Moreover, factual disputes persist with respect to the plaintiffs' procedural due process claim, and a clearer understanding of the factual basis for this underlying substantive constitutional claim is vital to resolving the qualified immunity determination. Without a well-defined picture of these facts, it is impossible to determine whether any potential unlawfulness was "apparent." *Anderson*, 483 U.S. at 640. Viewing these facts in the light most favorable to the non-moving party, genuine issues of material fact preclude pretrial resolution of this affirmative defense. Accordingly, the court will deny the defendants' motion for summary judgment motion as to the issue of qualified immunity.

**H. Intentional Infliction of Emotional Distress**

The defendants next move for summary judgment as to the plaintiffs' state law claims for intentional infliction of emotional distress ("IIED"). The plaintiffs' brief in opposition to the defendants' motion for summary judgment, however, does not specifically object to or respond to the defendants' motion on this issue. (Doc. 33). While this alone would be enough to grant the defendants' unopposed motion, the court will undertake a brief analysis of the IIED claim's underlying merits.

Pennsylvania state law recognizes a claim for IIED "[o]nly if conduct which is extreme or clearly outrageous is established." *Hoy v. Angelone*, 554 Pa. 134, 151 (1998). "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." *Id.* (citing *Buczek v. First National Bank of Mifflintown,* 366 Pa. Super. 551, 558 (1987)). Cases that have found a sufficient basis for IIED have presented only the most egregious conduct. *See, e.g.*, *Papieves v. Lawrence,* 437 Pa. 373, 376 (1970) (where the defendant, after striking and killing the plaintiff's son with an automobile and failing to notify the authorities or seek medical assistance, buried the body in a field, where it was discovered two months later); *Banyas v. Lower Bucks Hospital,* 293 Pa. Super. 122, 126 (1981)

(where the defendants intentionally fabricated records to suggest that the plaintiff had killed a third party, which led to the plaintiff being indicted for homicide); *Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1268 (3d. Cir.1979) (where the defendant football player's team physician released information to the press, knowing such information was false, to suggest that the plaintiff was suffering from a fatal disease).

On the other hand, "[c]ases regarding this tort in the employment context have been few." *Hoy,* 554 Pa. at 152 (1998). "[I]t is extremely rare to find conduct in the employment context that will rise to the level of outrageousness necessary to provide a basis for recovery for the tort of [IIED]." *Cox v. Keystone Carbon Co.,* 861 F.2d 390, 395 (3d Cir. 1988). "[W]hile loss of employment is unfortunate and unquestionably causes hardship, often severe, it is a common event and cannot provide a basis for recovery for [IIED]." *Id.* (quoting *Brieck v. Harbison-Walker Refractories,* 624 F.Supp. 363, 367 (W.D. Pa. 1985)). "[C]ourts applying Pennsylvania law have failed to find conduct outrageous where an employer deceived an employee into foregoing other employment . . . or even where the employer engaged in a premeditated plan to force an employee to resign by making employment conditions more difficult." *Id.* (citing *Madreperla v. Williard Co.,* 606 F.Supp. 874, 880 (E.D. Pa.1985)). The outcome of the plaintiffs' present IIED claim, which also

originated in the employment context, is clear. The court will therefore grant the defendants' unopposed motion for summary judgment as to the plaintiffs' claims for IIED.

## I. Breach of Implied Covenants of Good Faith and Fair Dealing

The defendants next move for summary judgment as to the plaintiffs' claims for breach of the implied covenants of good faith and fair dealing. Pennsylvania courts generally construe actions for breach of the implied covenants of good faith and fair dealing as breach of contract actions. "There may be an express or implied covenant of good faith and fair dealing in any contract between the parties, but if so, its breach is a breach of contract rather than an independent breach of a duty of good faith and fair dealing." *Engstrom v. John Nuveen & Co., Inc.*, 668 F.Supp 953, 958 (E.D. Pa. 1987). *See also Meyer v. Cuna Mut. Grp.*, 2007 WL 2907276, at *14 (W.D. Pa. Sept. 28, 2007) (stating that "[a] party is generally precluded from maintaining a claim for the breach of the implied duty of good faith and fair dealing separate and distinct from the underlying breach of contract claim"). The court will therefore construe this count in the complaint as an action for breach of contract.

The plaintiffs further contend that the contract giving rise to this breach is the collective bargaining agreement negotiated between the Police

Association and the Dupont Borough. (Doc. 33, at 25). As previously noted, while the parties do not dispute the existence of some agreement, neither party has provided the agreement itself for closer examination by the court. On this basis alone, the court could find that the plaintiffs have not met their burden of producing sufficient evidence from which a reasonable jury could find in their favor on this breach of contract claim.

The fact that the plaintiffs' state law claim for breach of contract is premised on the terms of a collective bargaining agreement, however, adds even further barriers to this claim's success. The Supreme Court has held that when a state law contractual claim is predicated on a collective bargaining agreement, the analysis shifts to account for the potentially preemptive effect of federal labor law. *See Allis-Chalmers Corp. v. Lueck*, 471 U.S. 202, 211 (1985). "[Q]uestions relating to . . . what legal consequences were intended to flow from breaches of [a labor] agreement must be resolved by reference to uniform federal law." *Id.*

In *Allis-Chalmers Corp. v. Lueck*, the Supreme Court acknowledged that it was *not* holding that "every state law suit asserting a right that relates in some way to a provision in a collective bargaining agreement . . . necessarily is preempted." *Id.* at 220. However, it instructed that the preemptive scope of federal labor law must be "fleshed out on a case-by-case basis," holding that

"when resolution of a state law claim is substantially dependent upon analysis of the terms of an agreement made between the parties in a labor contract, that claim must either be treated as a claim [under §301 of the Labor Management Relations Act] or dismissed as preempted by federal labor contract law." *Id.* The Supreme Court reiterated this standard in *Caterpillar Inc. v. Williams*, declaring that "[§]301 governs claims founded directly on rights created by collective bargaining agreements, and also claims substantially dependent on analysis of a collective bargaining agreement." *Caterpillar Inc. v. Williams*, 482 U.S. 386, 394 (1987). "When a plaintiff invokes a right created by a collective bargaining agreement, the plaintiff has *chosen* to plead what we have held must be regarded as a federal claim." *Id.* at 399. The relevant inquiry, therefore, focuses on whether the state law claim "can be resolved without interpreting the agreement itself." *Lingle v. Norge Div. of Magic Chef, Inc.*, 486 U.S. 399, 410 (1988). If it cannot, the state law claim is necessarily preempted by federal law. *See id.*

Even if the court were to forgive the glaring pleading deficiencies associated with this count of the plaintiffs' complaint, the claim still could not be resolved without some reference to the agreement itself. *See Guerrero v. Hovensa LLC*, 259 F. App'x 453, 458 (3d Cir. 2007) (holding that the plaintiff's claim for violation of the implied duty of good faith and fair dealing was

preempted as requiring an analysis of the terms of the collective bargaining agreement on which the claim was premised). The plaintiffs have put forward specific evidence of neither the terms of the allegedly breached collective bargaining agreement nor the defendants' actions that could have amounted to a breach. To the contrary, this claim is based on speculation alone and remains unsupported by material facts. For these reasons, the court will grant the defendants' motion for summary judgment as to the plaintiffs' claims for breach of the implied covenants of good faith and fair dealing.

### J. Intentional Interference with Advantageous Relations

The defendant next moves for summary judgment as to the plaintiffs' state law claims for "intentional interference with advantageous relations." (Doc. 1). The plaintiffs' brief in opposition to the defendants' motion for summary judgment, however, does not specifically object to or respond to the defendants' motion on this issue. (Doc. 33). Further, Pennsylvania state law does not specifically recognize a cause of action for intentional interference with advantageous relations. The closest equivalent would be a cause of action for tortious interference with a contract, which is comprised of the following elements: "(1) the existence of a contractual or prospective contractual relation between the complainant and a third party; (2) purposeful

action on the part of the defendant, specifically intended to harm the existing relation or to prevent a prospective relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual legal damage as a result of the defendant's conduct." *Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000) (citing *Strickland v. Univ. of Scranton*, 700 A.2d 979, 985 (Pa. Super. Ct. 1997)).

As the defendants convincingly argue, the plaintiffs have not cited to any materials in the evidentiary record to support their allegations of tortious interference. (Doc. 31). Even setting aside the obvious pleading deficiencies on this count of the complaint, the plaintiffs do not identify any specific evidence to establish purposeful actions by the defendants that were specifically intended to damage or prevent contractual relations. (Doc. 1). The plaintiffs instead rely on the bare conclusory allegations that defendant Murray "impact[ed], negatively and substantially, their relationship . . . with the [Dupont] Borough." (*Id.* at 41-42). Without more, the plaintiffs have not satisfied their burden of producing sufficient evidence on an essential element of their claim from which a reasonable jury could rule in their favor. *See, e.g.*, *Boyle*, 139 F.3d at 393. In fact, the plaintiffs never even contest these factual shortcomings by offering a responsive argument in their opposition to the defendants' summary judgment motion. (Doc. 33). For these reasons, the

court will grant the defendants' motion for summary judgment as to the plaintiffs' claims for tortious interference with contractual relations.

### K. Abuse of Process

The defendant next moves for summary judgment as to the plaintiffs' state law claims for abuse of process. The plaintiffs' brief in opposition to the defendants' motion for summary judgment does not specifically object to or respond to the defendants' motion on this issue. (Doc. 33). This mere fact would be sufficient to grant the defendants' unopposed motion, but the court will nonetheless undertake a brief analysis of the abuse of process claim.

To establish a claim for the "abuse of process" tort, it must be shown that the defendant "(1) used a legal process against the plaintiff, (2) primarily to accomplish a purpose for which the process was not designed" and that (3) "harm has been caused to the plaintiff." *Lerner v. Lerner*, 954 A.2d 1229, 1238 (Pa. Super. Ct. 2008) (quoting *Shiner v. Moriarty*, 706 A.2d 1228, 1236 (Pa. Super. Ct. 1998)). "The word process," as it is used in the abuse of process tort, "encompasses the entire range of procedures incident to the litigation process." *Shiner*, 706 A.2d at 1237. Abuse of process claims "rely for their impetus upon the filing of a docketed action, petition, or other legal modality." *Cruz v. Princeton Ins. Co.*, 972 A.2d 14, 19 (Pa. Super. Ct. 2009).

The defendants in the instant action never initiated any manner of legal proceedings against the plaintiffs, and the plaintiffs never even alleged as much. For an abuse of process claim to move forward, there must have been some "process" of which to speak. *See id.* Here, there is none. On this basis, the court will grant the defendants' unopposed motion for summary judgment as to the plaintiffs' abuse of process claims.

## L. Defamation

The defendants next move for summary judgment as to the plaintiffs' defamation claims against them. An action for defamation under Pennsylvania law requires the plaintiff to prove: (1) a defamatory communication, (2) its publication by the defendant, (3) its application to the plaintiff, (4) an understanding by the recipient of its defamatory meaning, (5) an understanding by the recipient that it was intended to be applied to the plaintiff, (6) special harm to the plaintiff resulting from its publication, and (7) the abuse of a conditionally privileged occasion. 42 PA. CONS. STAT. §8343. A statement is defamatory if it "tends . . . to harm the reputation of another as to lower him or her in the estimation of the community or to deter third persons from associating or dealing with him or her." *U.S. Healthcare v. Blue Cross of Greater Philadelphia*, 898 F.2d 914, 923 (3d Cir. 1990). Furthermore, the

statement must do more than merely annoy or embarrass the purported victim; "he must have suffered the kind of harm which has grievously fractured his standing in the community of respectable society." *Tucker v. Phila. Daily News*, 577 Pa. 598, 615 (2004).

To sustain a defamation claim, the plaintiff must point to *specific* defamatory communications and "identify specifically . . . to whom they were made." *Moses v. McWilliams*, 379 Pa. Super. 150, 170 (1988). The plaintiff bears the burden of showing whether a communication is capable of defamatory meaning, and "if the court determines that the challenged publication is not capable of defamatory meaning, there is no basis for the matter to proceed to trial." *Burton v. Teleflex Inc.*, 707 F.3d 417, 434 (3d Cir. 2013) (quoting *Kurowski v. Burroughs*, 994 A.2d 611, 617 (Pa. Super. Ct. 2010)). The "publication" element requires only that the defamatory statement be communicated to one person other than the defamed party. *Agriss v. Roadway Exp. Inc.*, 334 Pa. Super. 295, 309 (1984). As for the "special harm" requirement, a plaintiff must plead "a specific monetary or out-of-pocket loss as a result of the defamation." *Cornell Companies, Inc. v. Borough of New Morgan*, 512 F. Supp. 2d 238, 271 (E.D. Pa. 2007).

In addition, the Supreme Court in *New York Times Co. v. Sullivan* prescribed an additional element that plaintiffs alleging defamation must prove

when those plaintiffs are either public officials or public figures. Specifically, the "actual malice" standard requires that the defendant, in publishing the offending statement, acted "with knowledge that [the statement] was false or with reckless disregard of whether it was false or not." *New York Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).

The defendants' argument for summary judgment on the plaintiffs' defamation claims is twofold. First, the defendants assert that the plaintiffs have brought forth no evidence of defamatory statements by the defendants, and second, they argue that even if the defendants had made defamatory statements, those statements are absolutely privileged due to the defendants' status as "high public officials." (Doc. 31). The plaintiffs never directly respond to this latter argument.[7] Under Pennsylvania state law, "[a]bsolute privilege exempts a high public official from all civil suits for damages arising out of false or defamatory statements and even from statements or actions motivated by malice, provided the statements are made or the actions are

---

[7] Rather than meeting the defendants' argument that any allegedly defamatory statements were in fact protected by an absolute privilege, the plaintiffs, in their opposition to the instant summary judgment motion, instead raise non-responsive arguments based on "false light invasion of privacy," a tort that is similar to but wholly distinct from defamation. (Doc. 33, at 26).

taken in the course of the official's duties or powers and within the scope of his authority." *Jonnet v. Bodick*, 431 Pa. 59, 62 (1968) (quoting *Matson v. Margiotti*, 371 Pa. 188, 190 (1952)). The question of whether a given public officer is protected as a "high public official" depends on "the nature of his duties, the importance of his office, and particularly whether he has policy-making functions." *Id.*

The Pennsylvania Supreme Court has held that borough mayors qualify as high public officials for immunity purposes. *See Lindner v. Mollan*, 544 Pa. 487, 496 (1996) ("[t]here is no more important local public official than a mayor"). Similarly, the Third Circuit has held that borough council members are high public officials. *See Smith v. Borough of Dunmore*, 633 F.3d 176, 182 (3d Cir. 2011) (affirming the District Court's grant of summary judgment to borough council members on the basis of high public official immunity). Here, undisputed witness testimony indicates that the Dupont Borough Mayor has direct supervisory authority over the Police Department and that the Dupont Borough council members consistently vote on personnel matters concerning the Police Department, including whether to hire or fire new officers. (Doc. 33-10; Doc. 33-11; Doc. 33-13). Therefore, there is no question that any potentially defamatory statements about the plaintiffs from Dupont Mayor Lello or from Dupont Borough Council Members Knick, Kowalczyk, Hansen, and

Zielinski would have been made within the scope of their official duties. Accordingly, the court will grant the defendants' motion for summary judgment as to the defamation claims against named defendants Lello, Knick, Kowalczyk, Hansen, and Zielinski.

However, "[t]he status of a police chief for high public official immunity purposes is less clear." *Mariano*, 2013 WL 6234622, at *8. Courts are split on this question. *Compare Mariano*, 40 F. Supp. 3d at 420 (finding that a police chief was not entitled to high public official immunity), *with Cotner v. Yoxheimer*, 2008 WL 2680872, at *14 (M.D. Pa. July 2, 2001) (finding that a police chief was entitled to high public official immunity), *and Webb v. Bristol Borough*, 2012 WL 3024761, at *3 (E.D. Pa. July 24, 2012) (finding that whether a police chief is entitled to high public official immunity depends on whether the position entails policy-making, a determination that the judiciary should make on a case-by-case basis). Here, the evidence of record indicates that Officer in Charge Sean Murray had little discretion to make Dupont Borough policy. To the contrary, Murray was primarily in charge of overseeing the execution and implementation of policies that were originally crafted and handed down by the mayor and council members. (Doc. 33-12). In light of this, court finds that Murray does not qualify as a high public official for immunity

purposes, so this particular defendant may still be prone to liability for defamation.

Murray's only statement in the record that could potentially rise to the level of defamation is alleged in the plaintiffs' complaint as a tense exchange with plaintiff Kwiatkowski. (Doc. 1, at 12). There, the plaintiffs contend that Murray pulled Kwiatkowski aside and stated, "John [Saranchuk] is in a lot of trouble for tampering with evidence . . . and a ton of other things . . . bags of drugs in the evidence closet that were torn open . . . look tampered with . . . I can promise you that really bad things are coming for . . . Saranchuk." (*Id.* at 12-13). During fact discovery, Kwiatkowski testified further in a sworn deposition that Murray had indeed pulled him aside and stated that "Saranchuk . . . [is] going to jail . . . he is a criminal . . . [for] drugs being tampered with in the evidence locker." (Doc. 32, Exh. E).

Since Murray's accusations were made in reference to a former Officer in Charge of the Police Department, the allegedly defamed party would qualify as a "public official," which triggers the Supreme Court's "actual malice" standard. *See New York Times Co.*, 376 U.S. at 279-80. *See also Bartlett v. Bradford Publishing, Inc.*, 885 A.2d 562, 564 (Pa. Super. Ct. 2005) (finding police officers to be public officials who must prove actual malice to prevail on defamation claims). The actual malice standard is a constitutional safeguard

designed to protect the First Amendment interests that are inherently intertwined with actions for defamation. As such, allegations of actual malice must be supported "by clear and convincing evidence," which is "the highest standard of proof for civil claims." *Lewis v. Philadelphia Newspapers, Inc.*, 833 A.2d 185, 192 (Pa. Super. Ct. Sept. 18, 2003) (citing *Sprague v. Walter*, 656 A.2d 890, 904 (Pa. Super. Ct. Feb. 1, 1995)). Moreover, evidence of actual malice "is not adjudged by an objective standard." *Id.* Rather, the court uses a subjective standard, requiring evidence "that the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* (quoting *Curran v. Philadelphia Newspapers, Inc.*, 546 A.2d 639, 642 (Pa. Super. Ct 1988)).

This heightened constitutional standard strikes a severe blow to the instant defamation claim against Murray. At first glance, Murray's statements about Saranchuk appear sufficiently defamatory in nature, as they would both tend to harm Saranchuk's standing within respectable society and deter third persons from dealing with him. *See U.S. Healthcare*, 898 F.2d at 923; *Tucker*, 577 Pa. at 615. The plaintiffs' assertions, however, are devoid of any evidence that Murray's statements were motivated by actual malice. In fact, as the new Officer in Charge of the Police Department, many conceivable justifications existed for Murray's statements to Kwiatkowski. (Doc. 32, Exh. E; Doc. 33). For instance, the record suggests that several officers within the

Police Department were questioning where Saranchuk had gone and what had prompted his replacement. (Doc. 1; Doc. 32; Doc. 34). Murray, as the new Officer in Charge, would have needed to respond to these questions from his inferior officers in some way. It is largely inconceivable that Murray would have refrained entirely from commenting on why such rapid personnel changes were coming to the Police Department.

This is not to suggest that Murray's statements were entirely proper or prudent; they were not. However, under circumstances where the subject of the allegedly defamatory statements is a public official, the state law tort remedy often must yield to overriding free speech concerns. The plaintiffs here have not detailed sufficient evidence to establish that Murray uttered his statements with malice. Accordingly, the court will grant the defendants' motion for summary judgment as to the plaintiffs' defamation claim against named defendant Murray.

### M. Civil Conspiracy

The defendants next move for summary judgment as to the plaintiffs' claims for civil conspiracy. However, the plaintiffs' brief in opposition to the defendants' motion for summary judgment never specifically objects to or responds to the defendants' motion on this issue. (Doc. 33). To survive

summary judgment, a plaintiff bringing a civil conspiracy claim must produce sufficient evidence to establish that the defendants (1) acted in concert and (2) with malice (3) to commit an unlawful act or to do a lawful act by unlawful means and (4) accomplished some overt act in furtherance of the conspiracy. *See Skipworth by Williams v. Lead Indus. Ass'n*, 547 Pa. 224, 235-36 (1997).

Proof of "malice," meaning an "intent to injure, is essential in pro[ving] a conspiracy." *Commerce Bank/Pennsylvania v. First Union Nat. Bank,* 911 A.2d 133, 143 (Pa. Super. Ct. 2006). "Malice" requires that "the *sole* purpose of the conspiracy was to injure the plaintiff and that this intent was without justification." *Festa*, 803 F. Supp. 2d at 327 (granting summary judgment in favor of the defendants due to an inadequate showing of malice). Since malice "can only be found when the *sole* purpose of the conspiracy is to injure the plaintiff, a showing that a person acted for professional reasons, and not solely to injure the plaintiff, negates a finding of malice." *Id.* (citing *Bro-Tech Corp. v. Thermax, Inc.*, 651 F. Supp. 2d 378, 419 (E.D. Pa. 2009). Importantly, the success of a claim for civil conspiracy hinges on the success of an underlying tort claim. "Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious

liability for the underlying tort." *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000).

The plaintiffs here have failed to allege their claim for civil conspiracy with reference to any underlying tort. (Doc. 1, at 37). Instead, they vaguely and generally assert that the defendants had an "agreement" that was "entered into and carried out by the various [d]efendants . . . to cause harm and damage to the [p]laintiffs" and that "[t]hrough their various roles, decisions, and conduct . . . the [d]efendants carried out acts in furtherance of that agreement." (*Id.*). The plaintiffs offer nothing further to substantiate these allegations. The court has heretofore granted summary judgment in favor of the defendants on all of the plaintiffs' underlying state law tort claims. As such, the plaintiffs' claims for civil conspiracy cannot proceed forward. The court will therefore grant the defendants' unopposed motion for summary judgment as to the plaintiffs' claims for civil conspiracy.

### N. Loss of Consortium

Finally, the defendants move for summary judgment as to the plaintiffs' claims for loss of consortium. The plaintiffs' brief in opposition to the defendants' motion for summary judgment never specifically objects to or responds to the defendants' motion on this issue. (Doc. 33). A claim for loss of

consortium is intended to compensate an aggrieved spouse for the damaged marital expectations that result from injuries to his or her marital partner. *See, e.g.*, *Hopkins v. Blanco*, 457 Pa. 90, 93 (1974). The injury suffered by the claimant's spouse must be more than a pecuniary one; physical or emotional injuries must be established as well. *Browne v. Maxfield*, 663 F.Supp. 1193, 1207 (E.D. Pa. 1987).

While the losses alleged in a loss of consortium claim are personal to the uninjured spouse and arise from the deprivation of the injured spouse's society and services, it is well-settled that "the claim is derivative." *Darr Const. Co. v. W.C.A.B.*, 552 Pa. 400, 408 (1998). Even though a loss of consortium claim "remains a separate and distinct cause of action," a plaintiff still cannot recover for loss of consortium in the absence of the defendant's liability to his or her spouse. *See Little v. Jarvis,* 280 A.2d 617, 620 (Pa. Super. Ct. 1971). *See also id.*

The court has granted summary judgment in favor of the defendants on all of the plaintiffs' underlying state law tort claims thus far. As such, there are no remaining claims for physical or emotional injury onto which the derivative claims for loss of consortium may properly attach. *See Rost v. National R.R. Passenger Corp.*, 1989 WL 104809, at *7 (E.D. Pa. 1989) (where the husbands' tort claims were dismissed, leaving pending only breach of

contract, fraud, promissory estoppel, and public policy claims, "there remain no physical and emotional injury claims from which the wives can derive their loss of consortium injury"). Therefore, the plaintiffs' claims for loss of consortium cannot proceed forward. As a result, the court will grant the defendants' unopposed motion for summary judgment as to the plaintiffs' claims for loss of consortium.

## IV.    CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment will be **GRANTED IN PART** and **DENIED IN PART**. Specifically, the motion will be granted with respect to the plaintiffs' Fifth Amendment claims, Sixth Amendment claims, substantive due process claims, civil rights conspiracy claims, equal protection claims, official capacity claims, intentional infliction of emotional distress claims, claims for breach of the implied covenant of good faith and fair dealing, claims for intentional interference with advantageous relations, abuse of process claims, defamation claims, civil conspiracy claims, and loss of consortium claims.

The defendants' motion for summary judgment will be denied with respect to the plaintiffs' procedural due process claims, the plaintiffs' claims

for municipal liability under *Monell*, and the affirmative defense of qualified immunity. An appropriate order shall issue.




s/ *Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**


**Date: October 13, 2017**

O:\Mannion\shared\MEMORANDA - DJ\CIVIL MEMORANDA\2015 MEMORANDA\15-0893-01.docx